# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                        :
DEBORAH CHARLESTON and LARRY            :
CHARLESTON (w/h),                       :
                                        :        CIVIL ACTION
            Plaintiffs,                 :
                                        :
    v.                                  :        No. 08-5889
                                        :
SALON SECRETS DAY SPA, INC., et al.,    :
                                        :
            Defendants.                 :
_____ :

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                **APRIL 25, 2011**

Presently before the Court is a Motion for Partial Summary Judgment filed by Defendants

Salon Secrets Day Spa, Inc. ("Salon Secrets"), and Pamela A. Troyan ("Troyan"), a Motion for

Summary Judgment filed by Defendant Dr. Thomas J. Burke, D.O. ("Dr. Burke"), and a Motion

for Partial Summary Judgment filed by Defendant Barbara A. Lindner ("Lindner").  For the

following reasons, the Motions will be granted in part and denied in part.

## I.    BACKGROUND

Plaintiffs Larry and Deborah Charleston ("the Charlestons") claim that on February 10,

2007, Deborah Charleston suffered disfiguring facial burns as a result of a laser hair removal

procedure performed at Salon Secrets by Lindner, a salon aesthetician.  Troyan is the owner of

Salon Secrets.  The Charlestons aver that Defendant PT Lasers, LLC ("PT Lasers"), a limited

liability company that leased the laser, is co-owned by Troyan and Dr. Burke.[1]

_____

[1]Troyan testified that she is the 100 percent shareholder in Salon Secrets, and that she and
Dr. Burke are each "50 percent members" of PT Lasers.  (Troyan Dep. at 11-12.)

The Charlestons allege that Troyan partnered with Dr. Burke to acquire a prescription medical device called the "Harmony system" (the "laser") to provide laser hair removal services at Salon Secrets. The Charlestons assert that the device can only be sold to or on the order of a licensed physician. The Charlestons further contend that laser hair removal is a medical procedure which, under Pennsylvania law, requires a licensed physician to either perform the procedure himself or delegate the procedure to a trained technician. The Charlestons assert, however, that Lindner was unsupervised when she performed the laser hair removal procedure.

The Charlestons' Complaint alleges two different factual scenarios. Under one set of alleged facts, after Troyan used Dr. Burke's license as a means to acquire the laser device for Salon Secrets in 2004, Dr. Burke resigned from his position at Salon Secrets in 2006, allowed his Pennsylvania medical license to lapse, and cancelled his malpractice insurance. Troyan, nonetheless, continued to allow her employees to use the laser to treat clients without any medical supervision. The Charlestons further allege that Dr. Burke knew or should have known of this improper use of his laser, as he continued to pick up and drop off the laser at Salon Secrets even after his resignation.

Under an alternative set of alleged facts, based on verified information obtained from Troyan, Dr. Burke did not resign from Salon Secrets, but continued to serve as Salon Secrets's medical director, and was employed in that capacity at the time of Deborah Charleston's injury in February 2007. The Charlestons claim that Dr. Burke's Pennsylvania medical license had expired months before in October 2006, and thus, if it is true that he served as Salon Secrets' medical director and supervising physician at the time of the accident, then he is responsible for the harmed caused to Deborah Charleston by his agent, Lindner, as well as for the consequences

2

of practicing medicine in this Commonwealth without a license and without insurance.

On December 19, 2008, the Charlestons filed a Complaint in this Court, alleging that Defendants are liable for the burns caused to Deborah Charleston's face when Lindner disregarded the instruction manual for the laser and used it on a dark-skinned patient without first testing the laser's strength. They further argue that by failing to wait the mandatory twenty-four to forty-eight hours to complete the skin test required for dark-skinned patients like Deborah Charleston, Lindner's use of the laser caused second-degree burns on her face. The Charlestons assert that if Lindner had been working under the supervision of a licensed physician, she would have first performed a skin test in a small, unnoticeable area, and then two days later, the area would have been inspected to determine if Charleston was even a candidate for the procedure. However, because Lindner was unsupervised, these procedures were not followed. The Charlestons also claim that because Charleston had grey and white hair, she was probably not even a candidate at all, according to the black box warnings contained in the instruction manual.

The Charlestons' Complaint contains causes of action for negligence, informed consent, consumer fraud, common law fraud, negligent misrepresentation, negligence per se, negligent infliction of emotional distress, and loss of consortium. Dr. Burke, Troyan, and Salon Secrets filed prior Motions to Dismiss which were denied by this Court in a Memorandum and Order dated June 1, 2009.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks

"whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III.   DISCUSSION

### 1.   Negligence

The Charlestons have asserted a cause of action for negligence against Dr. Burke.  Dr. Burke maintains that the Charlestons cannot maintain a cause of action against him for medical malpractice.  The Charlestons assert that Dr. Burke's liability is not premised on the traditional patient-physician relationship where a defendant-doctor breached a medical standard in personally treating a patient, but rather on Dr. Burke supplying a restricted medical device to persons he knew were unauthorized by law to use the device.  A cause of action sounding in medical malpractice requires proof of four elements: (1) that the medical practitioner owed a duty to the patient; (2) that the practitioner breached that duty; (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) that the damages suffered by the patient were the direct result of the harm.  Montgomery v. South Philadelphia Medical Group, Inc., 656 A.2d 1385, 1390 (Pa. 1995) (citing Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (1990)).

To prevail, a plaintiff "must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage."  Phillips v. Cricket Lighters, 841 A.2d 1000, 1008 (Pa. 2003).  Whether a defendant owes a duty of care to a plaintiff is a question of law in Pennsylvania.  Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1366 (3d Cir. 1993); see also Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 61-62 (3d Cir. 2009).

Dr. Burke argues that he had no duty to any of the customers of Salon Secrets after he

informed Troyan in or around February of 2006 that he was no longer the Medical Director.[2]
(Dr. Burke Dep. at 94.)  In addition, Dr. Burke asserts that he owed no duty to Deborah

Charleston because there was never a doctor-patient relationship between them since he did not

perform any laser treatments on her, and in fact, had never even met her.  The Charlestons allege

that Dr. Burke is liable because he knew or should have known that the laser was being used

without his or any medical supervision.  The Charlestons contend that "as either the co-owner of

PT Lasers, LLC, or as the person who owned and controlled the laser, Dr. Burke can be held

accountable for the misuse of the device."  (Pl.'s Resp. Dr. Burke Mot. Summ. J. at 2.)  We

agree, and find that Dr. Burke did owe a duty to Deborah Charleston to prevent the laser from

being used without medical supervision under a negligence theory.

     We first note that there are several facts upon which the parties agree: (1)  that there was

an agreement between Troyan and Dr. Burke which formed PT Lasers in 2004; (2)  the

---

[2]Dr. Burke testified that he informed Troyan by telephone in February 2006 that he was
resigning as Medical Director of Salon Secrets.  (Dr. Burke Dep. at 94.)  As will be discussed in
more detail, infra, Troyan testified that this testimony was false.  (Troyan Dep. at 195.)
However, Jason Carpenter, Vice President of MedX who sold the laser to PT Lasers testified that
in or around May 2006, he was called by Troyan who informed him that Dr. Burke was no longer
going to work there, and that she was interested in finding a new medical director.  (Carpenter
Dep. at 36-37.)  Carpenter stated further that he told Troyan that "I'd be happy to help her find
another Medical Director, if possible.  I told her we sometimes get various calls from different
doctors who are interested in opening up a med spa."  (Id.)  He added that he did not call her
back because he did not obtain the name of another physician.  (Id. at 37.)  In addition, Carpenter
states that, in response to that phone call, he sent an e-mail to Dr. Burke asking his permission to
help Troyan look for a new director.  This May 22, 2006 e-mail is attached to Carpenter's
Deposition as Exhibit "A."  However, despite Troyan's assertions to the contrary, for the
purposes of addressing this issue, we will assume that Dr. Burke informed her in February 2006
that he was no longer Salon Secrets' Medical Director.

corporation leased the laser[3] which was to be used by Dr. Burke's private practice and Salon Secrets; (3) at least prior to February 2006, Dr. Burke had been acting as the Medical Director of Salon Secrets; (4) as part of the agreement for Dr. Burke to act as Medical Director, Troyan paid for half of Dr. Burke's malpractice insurance; (5) there are no written agreements regarding Dr. Burke's role as Medical Director of Salon Secrets; (6) Dr. Burke was never an employee of Salon Secrets, and never trained any of Salon Secrets' employees on the laser, including Lindner; (7) Dr. Burke never used the laser on Deborah Charleston, and, in fact, never met her; and (8) Dr. Burke only performed Botox at Salon Secrets, and stopped working there in or around March 2006.

In Pennsylvania, the determination of whether a duty of care is owed is a policy decision that requires the trial court to apply the "Althaus test." That inquiry requires that the court consider: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." Althaus v. Cohen, 756 A.2d 1166, 1169 (Pa. 2000). The Althaus court stated that although these factors guide the court's inquiry "[i]n determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered." 756 A.2d at 1168-69.

Here, in considering the elements of Althaus, we find that Dr. Burke owed a duty to

---

[3]The laser is a prescription devise and under FDA regulations could only be purchased by or on the order of a physician. See 21 C.F.R. § 801.109.

Deborah Charleston in ensuring that the laser not be used without proper medical supervision. First, with respect to the relationship between the parties, while Dr. Burke attempts to wash his hands of any duty to Salon Secrets' patients after he resigned as its Medical Director in February 2006, we find that he had a continuing duty to PT Lasers' and/or Salon Secrets' laser patients to ensure that the laser was only used with medical supervision. We note that, although Dr. Burke had no personal contact with Deborah Charleston, he obtained the laser, a restricted medical device, under his name and medical license. In addition, he was still the co-owner of PT Lasers after February 2006, and he took no steps after this date to dissolve his partnership with Troyan in PT Lasers. Moreover, he acknowledged that the laser could not be used without medical supervision. Dr. Burke testified at his deposition that he knew that hair removal is a medical service that could only be delegated to an aesthetician, and that he would be responsible for overseeing the use of the laser when it was delegated. (Dr. Burke Dep. at 43.) He also knew that after his license expired in October 2006, he was not permitted to practice medicine or supervise the performance of medical services in Pennsylvania. (Id. at 45.) Dr. Burke also admits that he never inquired whether Salon Secrets found another medical director to supervise the laser's use after he resigned. Dr. Burke testified:

> Q. Did you ever learn whether Salon Secrets hired a physician to serve in the role of Medical Director after your resignation in April of 2006?[4]

---

[4]There seems to be a discrepancy regarding the date that Dr. Burke claimed to have resigned as Medical Director of Salon Secrets. As noted earlier, Dr. Burke testified that he resigned in February 2006, although later questioning in his deposition refers to April 2006. However, regardless of the actual correct date, we find that Dr. Burke continued to owe a duty to Salon Secrets' laser patients at the time Deborah Charleston was injured on February 10, 2007.

A.  I know they were seeking one.  I did not know if they obtained one.

Q.  Do you know of anyone who ultimately did serve in that capacity at the spa?

A.  I do not know.

 * * * *

Q.  Did you ever e-mail Pam Troyan to determine, after your resignation in April 2006, whether she hired a Medical Director?

A.  No need to.

Q.  Did you ever telephone Pam Troyan to ask her whether she ever hired a Medical Director?

A.  No.

* * * *

Q.  In February, 2006, when you told Pam Troyan that you were resigning as Medical Director, did you have any understanding that the spa would need to hire a new Medical Director in order to lawfully use the device at the spa?

A.  Yes, that was discussed.

* * * *

Q.  Is it fair to say from the time that you resigned in April of 2006 through the end of February of 2007, you had no personal knowledge of any physician serving as a supervisor at the spa in connection with the use of the Harmony device?

A.  Yes.

(Dr. Burke Dep. at 92-95.)

Most significant in our decision is the fact that after Dr. Burke resigned as Medical Director, he continued to retain periodic physical possession and control over the laser by exchanging it back and forth with Salon Secrets.  Anna Ortiz ("Ortiz") testified that she was Salon Secrets' office manager from 2005 through the end of 2007, and that the laser was shared equally between Salon Secrets and Dr. Burke during this period.  (Ortiz Dep. at 7-8.)  She added that she was the one who would pick up the laser from Dr. Burke's office and bring it back to Salon Secrets, and that Dr. Burke would then pick up the laser from Salon Secrets.  The laser was exchanged every two weeks.  (Id. at 9-10.)  In addition, Dr. Burke acknowledged such an arrangement.  Dr. Burke testified that Ortiz did pick up the laser from his office about once a month from sometime late in 2005 until late 2007.  (Dr. Burke Dep. at 90-91.)  He stated that he also picked up the laser himself once a month on Sunday nights from Salon Secrets during this same time period, and had a key to the premises.  (Id. at 91-92.)

We find that it would not have been a burden on Dr. Burke to have simply kept physical possession of the laser until such time that he had assurances that a new medical director was overseeing its use.  He, however, continued to physically supply the laser back to Salon Secrets.  Thus, we find that there was more than a sufficient relationship between the parties under Althaus' first element to place a duty upon Dr. Burke.

With regard to the second Althaus factor, the social utility of the actor's conduct, the service being performed by Dr. Burke- supervising cosmetologists using the laser-holds

unquestionable significance for public health. It is apparent that the risks associated with the misuse of a medical laser are serious and can involve burns, blistering, and pigment changes to the skin requiring medical attention. These are among the reasons the FAA requires a physician to purchase such a device and requires a physician to supervise its use. With respect to the third factor, the nature of the risk of harm arising from Dr. Burke's decision to wash his hands of any responsibility regarding the laser after he purportedly in February 2006 is apparent- the risk to a Salon Secrets' patient's health posed by careless or unsupervised use of the laser. As to foreseeability, we find that such a risk of harm was reasonably foreseeable especially in light of the fact Dr. Burke continued to hand back physical possession of the laser to Salon Secrets on a regular basis choosing not to know whether the laser's use was being medically supervised.

With respect to the <u>Althaus</u>' fourth factor, we find that the "consequences of imposing a duty" upon a physician such as Dr. Burke in continuing to supervise the use of a laser that he leased is minimal. As repeatedly mentioned, Dr. Burke held actual physical possession of the laser and could have prevented Salon Secrets or any of its employees from unsupervised use of it by simply keeping it in his possession. Lastly, it is also clear under the fifth element that the Commonwealth of Pennsylvania is concerned with protecting public health with regard to the use and supervision of such lasers. Here, it would be in the public interest to impose a duty upon a physician to protect patients who seek medical treatment in non-medical settings who may not fully be aware of the risks of such treatments in a spa setting, and it would encourage physicians to supervise cosmetologists in a meaningful manner. Thus, in considering all the factors of <u>Althaus</u>, we find that Dr. Burke owed a duty to the Charlestons. 756 A.2d at 1169. We further find that it is for a jury to decide whether Dr. Burke breached that duty, and if so, whether such a

breach was a proximate cause of the harm suffered by Deborah Charleston.  <u>Montgomery</u>, 656

A.2d at 1390.

In addition, the Charlestons submit that Dr. Burke may also be liable under Section 324A

of the Restatement of Torts.[5]  This Section provides:

> One who undertakes . . . to render services to another which he should
>
> recognize as necessary for the protection of a third person . . . is subject to
> liability to the third person for physical harm resulting from his failure to
> exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm,
> or
>
> (b) he has undertaken to perform a duty owed by the other to the third
> person, or
>
> (c) the harm is suffered because of reliance on the other or the third person
> upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

Here, for all the reasons already discussed above regarding the <u>Althaus</u> factors, we find

that Dr. Burke may be liable to the Charlestons under this Restatement as well.  Moreover, we

find the case of <u>Gregg v. Kane</u>, No. 95-4630, 1997 WL 570909 at *1 (E.D. Pa. Sept.5, 1997) to

be analogous to the instant case.  In <u>Gregg</u>, the court  found that the plaintiff presented a

convincing argument that a physician may be liable under Section 324A of the Restatement of

Torts, even though that physician did not have a doctor-patient relationship.  In <u>Gregg</u>, the

plaintiff was enrolled in a clinical trial at Wills Eye Hospital ("Wills") and was injured during

---

[5]Pennsylvania courts follow the provisions of Section 324A of the Restatement of Torts.
<u>Cantwell v. Allegheny County</u>, 483 A.2d 1350, 1353 (Pa. 1984).

laser eye surgery. Plaintiff brought suit against the laser manufacturer, the hospital, and Drs. Kane and Trokel. Dr. Kane performed the laser surgery. Dr. Trokel served as the medical consultant to defendant laser manufacturer for the clinical study, and trained the doctors at Wills on the proper use of the laser. Id. at *1-2 . The court found that the plaintiff presented sufficient evidence from which a jury could reasonably conclude that Dr. Trokel, although he did not perform the surgery, undertook to render services to the physicians at Wills which he should have recognized as necessary for the protection of the plaintiff. Id. at *2. The court also determined that the plaintiff offered evidence from which a jury could reasonably infer that the doctors that Dr. Trokel trained did not have extensive experience with laser surgery and that Dr. Trokel was aware of this fact. Id. at *3. Additionally, the plaintiff offered evidence that Dr. Trokel was aware that the "clinical investigation was difficult and poorly understood by the physicians" and that he was "aware that a person could be injured in the surgery if the proper procedures were not followed." Id. Likewise, in the instant case, we find that the Charlestons have offered evidence from which a jury could reasonably infer that although Dr. Burke did not perform the laser procedures on Deborah Charleston, he owed her a duty to ensure that the laser not be used without medical supervision.

Lastly, with regards to the issue of negligence, Dr. Burke also asserts that expert testimony is required to establish the recognized standard of care in a medical malpractice action that is attributable to him under like circumstances, and that expert testimony must be provided that his conduct varies from the acceptable medical practice. Montgomery, 656 A.2d at 1390. Dr. Burke maintains that since the Charlestons have not produced an expert report which addresses whether he negligently carried out his duties and departed from the standard of care by

others in the community, a cause of action for medical malpractice against him cannot survive summary judgment.  (Dr. Burke Mot. Summ. J. at 5.)  We disagree.  We first note and as discussed above, the Charlestons acknowledge that their action against Dr. Burke is not the typical malpractice action, but rather, is a common law negligence action.  Nonetheless, we find that expert testimony regarding Dr. Burke's standard of care is not necessary here.  As Dr. Burke acknowledges, the exception to this requirement that expert testimony be submitted in a medical malpractice action applies when the "matter under investigation is so simple, and lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of non professional people."  Chandler v. Cook, 265 A.2d 794, 796 (Pa. 1970).

Indeed, Montgomery held that a plaintiff must present expert testimony that the acts of the medical practitioner deviated from good and acceptable medical standards, and that such deviation was a substantial factor in causing the harm suffered, however it also indicated that such expert testimony is only required "[W]here the events and circumstances of a malpractice action are beyond the knowledge of the average lay person."  656 A.2d at 1390; see also Cohen v. Albert Einstein Med. Center, 592 A.2d 720, 723 (Pa. 1991).

Dr. Burke argues that the instant case is "not so simple, or that the lack of skill or want of care so obvious that it is within the range of experience and comprehension of non-professional persons."  (Dr. Burke Mot. Summ. J. at 6.)  We disagree, and find that the question of whether Dr. Burke deviated from acceptable medical standards regarding the laser to be within the range and comprehension of the average person.  Thus, the Charlestons lack of expert testimony regarding Dr. Burke's acts or omissions does not defeat their negligence action, and summary judgment is denied as to this issue.

14

## 2. Pennsylvania Unfair Trade Practices and Consumer Protection Law

The Charlestons have also alleged that Troyan, Salon Secrets, Dr. Burke, and Lindner all engaged in or allowed others to engage in the unauthorized practice of medicine, violating the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  73 P.S. § 201-1 et. seq.  (Am. Compl. at ¶ 265.)  The Charlestons describe the alleged fraudulent scheme as follows:  Troyan and Dr. Burke formed PT Lasers to lease a medical laser that only a doctor could purchase.  Thereafter, Salon Secrets continued to market and act as though Dr. Burke was affiliated with the spa as its medical director, when in fact, he was not.  Troyan was aware of this fact, but she nevertheless allowed her cosmetologist employee to use the laser without any medical supervision, and concealed Dr. Burke's resignation from her staff and from her clients.  The Charlestons also argue that Dr. Burke either permitted Salon Secrets to use his name and affiliation to promote laser hair removal at the spa, or he nonetheless allowed the unsupervised use of his equipment at Salon Secrets by dropping off the laser at the facility even after his medical license in Pennsylvania had expired.  The Charlestons have also alleged that as of October 31, 2006, Dr. Burke had resigned from his position at Salon Secrets and allowed his Pennsylvania medical license to lapse.  (Id. ¶ 23.)  They further assert that from November 2006 through February 10, 2007, Dr. Burke regularly traveled to Salon Secrets to either pick up or return the laser device to Salon Secrets after using the device in his own private practice.  (Id. ¶ 26.)

The UTPCPL prohibits "unfair competition" and "unfair or deceptive acts or practices" in the conduct of any trade or commerce, 73 P.S. § 201-3, and the statute creates a private right of action in any person who purchases or leases goods or services primarily for personal, family or

household purposes and suffers any ascertainable loss of money or property as a result of a method, act or practice declared unlawful. 73 P.S. § 201-9.2. The UTPCPL lists 20 specific "unfair methods of competition" and "unfair or deceptive acts or practices." 73 P.S. § 201-2(4)(i)-(xx). The statute also includes a catchall provision which prohibits "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4)(xxi).[6]

To establish a claim under the UTPCPL, a plaintiff must prove the traditional elements of common law fraud. Toy v. Metropolitan Life Ins. Co., 928 A.2d 186 (Pa. 2007); Weinberg v.

---

[6]Specifically, the Charlestons assert that the following definitions for "Unfair Methods of Competition" and "Unfair or Deceptive Acts or Practices" are applicable to the acts of the Defendants:

> (1) Passing off goods or services of another;
>
> (ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
>
> (iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;
>
> . . .
>
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;
>
>  . . .
>
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

See 73 P.S. § 201-2(4).

Sun Co., Inc., 777 A.2d 442 (Pa. 2001).  These elements include (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).  The Supreme Court of Pennsylvania has consistently interpreted the UTPCPL's causation requirement to demand a showing of justifiable reliance, not simply a causal connection between the misrepresentation and the harm.  Hunt v. U.S. Tobacco Co., 538 F.3d 217, 222 (3d Cir. 2008).

The Defendants argue that there is insufficient evidence in the record that Deborah Charleston justifiably relied upon any representation(s) or misrepresentation(s) made by Troyan, Dr. Burke, Lindner or any other employee of Salon Secrets regarding laser procedures and/or the presence of a medical director in making her decision to have such procedures performed. (Troyan Mot. Summ. J. at 13.)  We agree.  Deborah Charleston's own testimony indicates that Dr. Burke,  Troyan, Lindner, or any other staff at Salon Secrets did not specifically draw her attention to the laser hair service prior to her appointment with Lindner on February 10, 2007. (Charleston Dep. at 114-115.)   She testified that she initially found Salon Secrets when she "Googled" the internet regarding eyelash extensions.  (Id. at 110.)  She acknowledged that she did not read anything on Salon Secrets' website about laser hair removal, and had no interest in such a procedure.  (Id.)  In fact, Charleston testified that prior to February 10, 2007, she did not know that Salon Secrets even offered hair laser removal.  (Id.)  She stated that she also did not see Dr. Burke's name on the website, nor did she see any business cards or literature about any physician on the reception desk at Salon Secrets.  (Id. at 110-11.)  Charleston did testify that she

17

remembered seeing a sign in the waiting room with Dr. Burke's name on it, but could not

describe what it said about him.  (Id. at 113-14.)  She further testified that prior to February 10,

2007, she had not ever talked with Lindner about laser hair removal, and, in fact, Lindner never

mentioned it as a service that could be provided by Salon Secrets.  (Id. at 116-17.)  She testified

that the first time that laser hair removal was mentioned was on February 10, 2007 when Lindner

"brought it up" while she was at Salon Secrets for "micro dermabrasion."[7]  (Id. at 117.)

Charleston testified that prior to performing the micro dermabrasion procedure, Lindner brushed

her hand along her jaw line and stated that her skin was "rough," and that she was "going to give

[her] a laser."  (Id. at 120.)  Charleston acknowledged that prior to this, there had been no

discussion that she needed laser treatment."  (Id. at 121.)  She stated that she didn't sign any

consent forms, and that Lindner went ahead and performed the laser treatment on her.  (Id. at

122.)

Based on this testimony, we find that the Charlestons have failed to establish the

necessary element of reliance in order to bring actions under the UTPCPL against these

Defendants.  Accordingly, because Barbara Charleston did not rely any representations or

misrepresentations on the part of Troyan, Dr. Burke, Lindner, or any employee of Salon Secrets

in deciding to have the laser procedures performed, summary judgment is granted to these

Defendants as to the causes of action brought under the UTPCPL.[8]

---

[7]Deborah Charleston described "micro dermabrasion" as involving a "buffer type machine that goes around in circles" on the face.  (Deborah Charleston Dep. at 120.)

[8]It also follows that because the Charlestons have not presented evidence to support their claims under the UTPCPL, they would not be entitled to treble damages under the UTPCPL.  In addition, it also follows that because the Charlestons have not established reliance upon any representation or misrepresentation of Troyan, Dr. Burke, Lindner, or any other employee of

### 3. Negligent Misrepresentation

The Charlestons next assert a cause of action for negligent misrepresentation against Dr. Burke. In order to succeed on a claim of negligent misrepresentation under Pennsylvania law, a plaintiff must prove four elements by a preponderance of the evidence: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity, or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. Gibbs, 647 A.2d at 890; see also Avondale Cut Rate, Inc. v. Associated Excess Underwriters, Inc., 178 A.2d 758 (Pa. 1962).

For the same reasons discussed in denying the Charlestons' claims for consumer fraud under the UTPCPL and common law fraud, we find that the Charlestons have not established that Deborah Charleston relied on any misrepresentation of Dr. Burke in deciding to undergo the laser hair removal treatments. Thus, summary judgment is granted in favor of Dr. Burke regarding this claim.

### 4. Negligence Per Se

In their Complaint, the Charlestons also aver that Defendants, Troyan, Salon Secrets, Lindner, PT Lasers, and Dr. Burke violated statutory provisions of the Osteopathic Medical Act,

---

Salon Secrets, they also cannot maintain causes of action for common law fraud against any of these Defendants. Accordingly, summary judgment is granted as well for common law fraud in favor of Troyan, Dr. Burke, Linder, and Salon Secrets. See Gibbs, 647 A.2d at 889.

in particular, 63 P.S. §§ 271.1- 271.18,[9] and the Pennsylvania Medical Practice Act, P.S. §§ 422.1-422.51(a),[10] and that such violations establish a cause of action for negligence per se. The concept of negligence per se establishes both duty and the required breach of duty where an individual violates an applicable statute, ordinance or regulation designed to prevent a public harm. Cabiroy v. Scipione, 767 A.2d 1078, 1079 (Pa. Super. 2001). In analyzing whether a claim based on negligence per se for violating a statutory provision exists, a plaintiff must establish whether the purpose of the statute is to protect the interest of a group of individuals, as opposed to the general public, and whether the statute clearly applies to the conduct of the defendant. Wagner v. Anzon, Inc., 684 A.2d 570, 574 (Pa. Super. 1996.)

Regarding the first requirement, the Pennsylvania Supreme Court has stated that the purpose of the asserted statute or regulation must be:

> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the
>
> harm results.

Id. at 574. It must be first pointed out that Troyan, Salon Secrets, and Lindner[11] have not

---

[9]63 P.S. § 271.3 specifically prohibits the practice of osteopathic medicine and surgery by anyone who does not hold a Pennsylvania license.

[10]63 P.S. § 422.10 provides that only a Pennsylvania Board licensed doctor is permitted to "practice medicine and surgery" in the Commonwealth.

[11]PT Laser has not filed a summary judgment motion.

challenged these negligence per se claims against them in their Summary Judgment Motions. Consequently, we will not address this cause action with regard to them, but only as to Dr. Burke. In their Complaint, the Charlestons state:

> In the event that Pamala Troyan's verified statement is true and that Dr. Burke continued to serve as Medical Director of the Spa as of February 10, 2007, and that he served therefore as the supervising physician, then Dr. Burke himself engaged in the unauthorized practice of medicine by failing to have a Pennsylvania license in place at that time.

(Compl. ¶ 319.)

Troyan testified that she first learned on or around December 8, 2007 in a conversation with Dr. Burke that he was no longer Salon Secrets' Medical Director. She also learned at this time that he was no longer a licensed physician in Pennsylvania, and that he had cancelled his malpractice insurance. (Troyan Dep. at 23-26, 29, 234.) However, we find that the record contains sufficient evidence to establish that Dr. Burke had informed Troyan in February or April 2006 that he was resigning as Salon Secrets' Medical Director. As noted earlier,[12] in addition to Dr. Burke's own testimony as to this fact, this finding is supported by Jason Carpenter, Vice President of MedX, who sold the laser to PT Lasers. He testified that in or around May 2006, he was called by Troyan who informed him that Dr. Burke was no longer going to work there, and that she was interested in finding a new medical director. (Carpenter Dep. at 36-37.) Carpenter also testified that he told Troyan that "I'd be happy to help her find another Medical Director, if possible. I told her we sometimes get various calls from different doctors who are interested in opening up a med spa." (Id.) In addition, Carpenter testified that in response to Troyan's phone

---

[12]See footnote 2.

call, he sent an e-mail to Dr. Burke asking his permission to help Troyan look for a new director.[13]  The record also contains a letter from Dr. Burke to his medical malpractice carrier, PA JUA, dated March 18, 2006, in which he informs them that he is cancelling his insurance effective April 21, 2006.[14]  (Pl.'s Resp. Lindner Mot. Summ. J., Ex. M at 14.)  Accordingly, because the record establishes that Dr. Burke resigned as Medical Director at Salon Secrets in February 2006, we find that Dr. Burke did not violate the Osteopathic Medical Act or the Pennsylvania Medical Practice Act by illegally practicing medicine at the time Deborah Charleston was injured on February 10, 2007.[15]  Thus, we grant summary judgement to Dr. Burke as to this cause of action.

### 5.  Negligent Infliction of Emotional Distress

The Charlestons next bring causes of action for negligent infliction of emotional distress against all Defendants.[16]  In Pennsylvania, a cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the

---

[13]This May 22, 2006 e-mail is attached to Carpenter's Deposition as Exhibit "A."

[14]In addition, when asked at her deposition to confirm that a deposit of $2,568.25 was made into the PT Lasers bank account on May 24, 2006 from Dr. Burke's medical malpractice carrier, Troyan denied knowing what the money was for.  (Troyan Dep. at 124.)

[15]Even though we find that Dr. Burke was not illegally practicing medicine when Deborah Charleston's laser treatment were performed by Lindner, as discussed supra, we do find that he owe her a duty as a patient at Salon Secrets to ensure that the laser's use was being medically supervised.

[16]As was the case with the negligence per se claims, Troyan, Salon Secrets, and Lindner have not challenged these negligent infliction of emotional distress claims against them in their individual Summary Judgment Motions.  Consequently, we will not address this cause action with regard to each of these Defendants, but only as to Dr. Burke.

plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative. Toney v. Chester County Hosp., 961 A.2d 192, 197 (Pa. Super. 2008); see also Doe v. Philadelphia Community Health Alternatives AIDS Task Force, 745 A.2d 25, 26 (Pa. Super. 2000), aff'd, 767 A.2d 548 (Pa. 2001). The court in Toney stated that "under this theory of recovery, a plaintiff must establish the elements of a negligence claim, "i.e., that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." 961 A.2d at 198.

In this case, the Charlestons rely on the first theory, i.e., that Dr. Burke had a contractual or fiduciary duty toward Deborah Charleston. Dr. Burke argues that he had no fiduciary duty to Deborah Charleston since he informed Troyan in February 2006 that he would no longer be its Medical Director, he did not perform the laser procedures on her, and never had any contact with her. However, as discussed above, we determined that Dr. Burke did, in fact, owe a duty to patients of Salon Secrets to ensure that the laser he continued to supply to Salon Secrets was used with medical supervision. We are of the opinion that the question whether Dr. Burke owed a fiduciary duty to Deborah Charleston is one for the jury. Although, Dr. Burke claims to have terminated his relationship with Salon Secrets in February 2006, he did nothing to terminate his partnership in PT Lasers as a Pennsylvania entity. In addition, he continued to own and control the laser by continuing to physically supply the laser to Salon Secrets. For these reasons, we will deny Dr. Burke's request for summary judgment on this issue.

### 6. Informed Consent

Next, we consider the Charlestons' cause of action against Dr. Burke for his failure to

obtain informed consent from Deborah Charleston for the laser procedures. Under Pennsylvania law, a physician is required to obtain consent from his patient concerning any non-emergency procedure enumerated in the medical Care Availability and Reduction Act ("MCARE"), 40 P.S. § 1303.504. The Act requires the physician to obtain the patient's full, knowing, and voluntary informed consent prior to the following procedures:

> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.
>
> (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

40 P.S. § 1303.504 (a).

The law requires that the patient be advised as to those material facts, risks, complications and alternatives that a reasonable person in the patient's situation would consider significant in deciding whether to undergo the procedure. See Moure v. Raeuchele, 604 A.2d 1003 (Pa. Super. 1989), rev'd on other grounds, 604 A.2d 1003 (Pa. 1992). In order to constitute a valid consent, the patient must be informed of the material risks of the procedure prior to surgery. Absent this "informed consent," the physician may be held liable to a plaintiff under a theory of battery, for injuries arising from the undisclosed risk. See Gray v. Grunnagle, 223 A.2d 663 (Pa. 1968).

Dr. Burke asserts that laser hair removal should not be deemed a surgical service subject to Pennsylvania informed consent requirements. Section 1303.504(c) of MCARE specifically

requires expert testimony to determine whether laser hair removal is a procedure that required a consent. This section states:

> **Expert testimony --**Expert testimony is required to determine whether the procedure constituted the type of procedure set forth in subsection (a) and to identify the risks of that procedure, the alternatives to that procedure and the risks of these alternatives.

40 P.S. § 1303.504(c). Here, the Charlestons have not produced expert testimony as mandated under Pennsylvania law. Consequently, the Charlestons have failed to make out a *prima facie* informed consent claim, and this cause of action fails as a matter of law.

### 7. Vicarious Liability

We next address the issue of vicarious liability regarding Dr. Burke. The Charlestons assert that as the person who controlled the laser, and as a person who financially benefitted from its use at Salon Secrets, it would be proper to hold Dr. Burke vicariously liable for the negligent use of the laser by Lindner. We agree.

The Pennsylvania Supreme Court has long held a corporate principal liable:

> for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances and misfeasances of [its] agent committed within the scope of his employment even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment.

Aiello v. Ed Saxe Real Estate, Inc., 499 A.2d 282, 287 (Pa. 1985); see also Travelers Cas. & Sur. Co. v. Castegnaro, 772 A.2d 456 (Pa. 2002); Solomon v. Gibson, 615 A.2d 367, 371 (Pa. 1992).

Here, there is no question that Lindner performed the laser procedures within the scope of her employment. As already discussed above, we determined that Dr. Burke had a duty to the customers at Salon Secrets to ensure that the laser was not used without medical supervision

especially considering the fact that he continued to supply the laser to it even after he resigned as its Medical Director. Moreover, even after he purportedly resigned as the Medical Director, he took no action to dissolve his partnership in PT Lasers and was still in this partnership with Troyan at the time Deborah Charleston was injured by the laser treatments on February 10, 2007. We, thus, find that Dr. Burke can be held vicariously liable for the negligence of Lindner, and we will deny summary judgment on this issue.

### 8. Individual Liability of Troyan and Dr. Burke

The Charlestons also claim that both Troyan and Dr. Burke should be held individually liable. There are two theories under which a corporate officer or shareholder may be held individually liable for the obligations of the corporation: the "participation theory" and "piercing the corporate veil." The Pennsylvania Supreme Court examined the differences between the participation theory and the doctrine of piercing the corporate veil in Wicks v. Milzoco Builders, Inc., 470 A.2d 86 (Pa. 1983). The court stated:

> There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation. Where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore its acts are truly his. Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity.

Id. at 90.

"Participation theory, in simple terms, is a theory which imposes personal liability on corporate officers or shareholders where they have personally taken part in the actions of the

corporation." <u>First Realvest, Inc. v. Avery Builders, Inc.</u>, 410 Pa. Super. 572, 577 (Pa. Super. 1991). Under the participation theory, "a corporate officer can be held liable for 'misfeasance,' i.e., the improper performance of an act, but not for 'mere nonfeasance,' i.e., the omission of an act which a person ought to do." <u>Brindley v. Woodland Village Rest.</u>, 438 Pa. Super. 385, 391 (Pa. Super. 1995). In <u>Brindley</u>, the Pennsylvania Superior Court determined that the negligence of the defendant restaurant owners in keeping the restroom clean, which led to the plaintiff's injury, was "more analogous to negligence consisting of nonfeasance . . . ." <u>Id.</u> at 394.

Here, the Charlestons have alleged negligence by Troyan more akin to "misfeasance" because there is evidence in the record that Troyan knew that Dr. Burke resigned as Medical Director in February of 2006, yet continued to allow her staff to use the laser without medical supervision.[17] There is also evidence that Troyan continued to represent to the public and to her employees that Dr. Burke was the Medical Director at Salon Secrets by continuing to have Dr. Burke's name appears on a sign in the office after she knew he had resigned. Consequently, we conclude that Troyan can be held individually liable under the "participation theory," as well as her capacity as owner of Salon Secrets and partner in PT Lasers.

With regard to Dr. Burke, we find that Dr. Burke can also be held individually liable under the "participation theory." It is arguable whether his actions could be deemed as "mere nonfeasance" because he failed to do an act- make sure that the laser was not used without medical supervision. However, we are of the opinion that Dr. Burke's acts in continuing to

---

[17]Salon Secrets' estheticians, Stephanie Burns and Kim Lancashire, testified that they were also not aware that Dr. Burke had resigned or that Troyan was looking for a new medical director. (Burns Dep. at 39-40, Lancashire Dep. at 44.)

supply the laser to Salon Secrets and choosing not to know whether the laser is being medically supervised bring his actions to a level of "misfeasance." Thus, Dr. Burke can be held individually liable as well as a partner in PT Lasers.

However, we do find that the Charlestons have not shown facts that support the rare application of the doctrine to pierce the corporate veil. "In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder." Village at Camelback Property Owners Ass'n v. Carr, 371 Pa. Super. 452, 461 (Pa. Super. 1988), aff'd. 572 A.2d 1 (Pa. 1990) (citing Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc., 727 F.2d 279 (3d Cir. 1983)). "Thus, we inquire, inter alia, whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own." Id. (citing Ambrose, 727 F.2d at 284).

Here, the Charlestons have provided no evidence with regard to any of these factors or otherwise shown that any of the corporate entities involved are sham operations. Accordingly, we find that the Charlestons have not shown that a genuine issue of material fact exists regarding Troyan and Dr. Burke's individual liabilities by piercing the corporate veil, but that jury issues exist regarding their individual liabilities under a "participation theory." Brindley, 438 Pa. Super. at 391.

### 9. Punitive Damages

Lastly, Defendants, Troyan, Salon Secrets, Lindner, and Dr. Burke have asserted in their Motions that summary judgment should be granted regarding the Charlestons' claim for punitive damages against each of them. We will, however, deny this request at this time.

Under Pennsylvania law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) (quoting Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984)). A claim for punitive damages "must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." Id. at 772.

Here, the record contains evidence that each of these Defendants may have committed acts which amount to "reckless indifference" to the rights of the Charlestons. Accordingly, we leave this issue for a jury to decide, and deny summary judgement to all the named Defendants on the Charlestons' claims for punitive damages.

An appropriate Order follows.